ODOM, J.
 

 Plaintiff and defendant were married in February, 1927, and lived together until June, 1930. By this suit, which was filed on July 10, 1931, the wife asks for judgment decreeing separation “a mensa et thoro” from her •husband on the ground of cruel treatment. She alleges that at various times from June, 1929, to the date of their separation, her husband was guilty toward her of such outrages and cruel treatment as to render their living together insupportable.
 

 Amplifying her allegations of cruel treatment, she specifies that in June, 1929, her husband so severely beat and abused her that the neighbors had him arrested; that in July of the same year, he struck, beat, abused, and cursed her; that he threatened to strike her with an iron rod which he then held in his hand; that on occasions he had choked and otherwise abused her until she called upon neighbors for help; that on June 15, 1930, he pulled a chair from under her causing her to fail, from which fall she was so severely injured that it became necessary for her to •have her back plastered; and that during the entire period of their married life, her husband had refused to adequately support her. She disclaims any fault on her part.
 

 Defendant in answer denied each and all of plaintiff’s allegations except that as to the marriage. There was judgment for defendant rejecting plaintiff’s demands at her costs. She appealed.
 

 1. The trial judge was of the opinion that plaintiff was not entitled to relief under the showing she made and rejected her demands. We think he manifestly erred.
 

 Plaintiff testified that on several occasions, defendant had tried to choke her and to break her arms; that he pulled a chair from under her, which caused her to fall, and that the fall caused such injuries to her back that she had to be “strapped up” with adhesive tape ; that when this took place, she remonstrated with him and that he said to her, “I ought to' break your neck”; that on one occasion she was ironing and let the iron slip and fall, whereupon he became enraged, ran at her
 
 *471
 
 with an iron rod, and “said he ought to shove it down nay throat”.; that he put her out of the house, locked the doors, and that for one night she and her children (not of this marriage) had to sleep outside on bedding supplied by a neighbor; and that on another occasion he put her and her children out in the street.
 

 She further testified that on one occasion he beat her so severely that neighbors caused his arrest; that he went to St. Louis, stayed five months, leaving her penniless, although she was privileged to purchase a few groceries on credit; that in 1930 she was compelled to apply to relatives for food; and that he cursed her in the presence of her children. '
 

 Robert Rothe, a brother of plaintiff’s first husband, testified that on the occasion of defendant’s arrest, he (witness) talked with defendant, told him he had been informed that he had mistreated his wife, and that defendant said: “I have. Things are not going right in the school^ (defendant is a plumber for the public schools in New Orleans) and men will not show up and I would come home cranky.”
 

 Witness said defendant admitted he had pulled the chair from under his wife and he should not have done so, and admitted that “he had picked up a bat to beat her.” He said defendant admitted that he had been cruel to his wife and was asked if defendant properly provided for-her. He said: “No, me and my sisters were bringing food up to them where they lived.”
 

 After this witness left the stand, plaintiff was recalled and was asked if she was arrested along with her husband for disturbing the peace, and she said; “Yes, I was not going to let him curse and abuse me. * * * He was quarrelling with me for nothing at all and I was not going to stand there and let him curse me and I tried to catch to everything I had like a cat and he would not let me take my clothes.” She was asked: “You were abusing each other?” She replied: “He was abusing me. * * * I was trying to get out.”
 

 Mrs. Gurry, who lived across the alley, said, “Mr. Jordan was an awful crank and I would hear him quarreling.” She corroborated plaintiff’s testimony concerning the incident of defendant’s pulling the chair from under plaintiff, although she only heard them. She said she had supplied defendant with bedding on the occasion of her being put out of the house, and that the language used by Mr. Jordan “was terrible.” She said Mr. Jordan had shoved his wife and her children down the steps. She was asked, “You thought they would kill each other?” And she said, “Yes, the fighting was terrible.”
 

 Mr. Pirreno, another neighbor, said; “I heard him one time, when something dropped in the kitchen — -they had a fuss over it and he said if she did not shut up her mouth he would run a rod down her throat.”
 

 Defendant took the stand in his own behalf. He was asked if he had heard what his wife said and he said he had, and was then asked if he had ever struck her and said he had not. He was asked if he had ever cursed his wife and said: “I might have said she was a liar, or used words stronger; I never take my maker’s name in vain.”
 

 Further than this, he made no denial of his wife’s testimony nor that of Mr. Rothe and the neighbors. He did not deny that he had tried to choke her, that he had in a fit of an
 
 *473
 
 ger pulled the chair from under her, that he had threatened to beat her with a bat, and threatened to shove an iron rod' down her throat, that he had put her out of the house, that he had left her penniless for five months, and did not deny that he had admitted to Mr. Rothe that he had been cruel to his wife.
 

 He admitted that he and his wife had “troubles,” that they had quarreled about money, about a dog, and about their children (he had ten by a former marriage, and she had three; there were none of this marriage).
 

 Defendant called his friend Mr. Tattinger, who had visited them. He said they quarreled while he was there, but it was “just child’s play, nothing serious. Mrs. Jordan made several complaints to me and my advice to her was, with three children (meaning plaintiff’s children) to try to get along and the complaints she had were only trivial affairs or child’s play.”
 

 He was asked: “And you tried to get Mrs. Jordan a job with the School Board?” “Yes, it was my duty as a Christian. I gave her several things when I broke up my home and she called several times and I gave her money, as she had no food.”
 

 Another witness for defendant was Jacob Slawson, superintendant of maintenance of Orleans parish school board, under whom defendant worked. He said defendant was very efficient and a man of good steady habits and bore a good reputation.
 

 The testimony of plaintiff and her witnesses shows that defendant was guilty toward her of outrages, ill and cruel treatment of such a nature as to render their living together insupportable.
 

 See article 138, par. 3, Civil Code.
 

 She is therefore entitled to a separation from bed and board.
 

 2.
 
 Counsel for defendant has referred-us to many cases in which it was said by this court that judgments of trial courts based purely upon questions of fact are entitled to great weight and will not be set aside unless manifestly erroneous. We need not cite them here — they are numerous, and we here take occasion to say again that it is with reluctance that we disturb such judgments. The reason is that the trial judge sees and hears the witnesses — we do not. This is a great advantage, because by seeing and hearing them, the trial judge is enabled to form some estimate of their intelligence and veracity. By observing their manner of testifying, their attitude toward the court and the ease, he is enabled to form some idea as to whether they are influenced by bias or prejudice. Having this advantage, which is not afforded the members of the appellate court, he is in better position than they are to say what weight should be given their testimony. In cases where the testimony is conflicting, it is often necessary, in order to properly determine the issues presented, to sift the wheat from the chaff, to separate the sound from the unsound, the gold from the dross. He who sees the witnesses, who hears what they say, is in better position to do the sifting,-the separating, than he who reads what they say.
 

 So we defer to the judgment of trial judges as to the intelligence and veracity of witnesses, and the weight which should be given their testimony. But further than this, the rule invoked has no application. In the absence of any intimation from the trial judge that he had reasons to discredit the tes
 
 *475
 
 timony of a witness or group of witnesses, we must assume that they are all of. equal credibility, unless the contrary appears from the written record, which is not often' the case.
 

 In the absence of any intimation or suggestion from the trial judge to the contrary, we must assume that his judgment was based upon what he considered a preponderance of the testimony. Either that, or he was not satisfied that the testimony adduced, if believed, was sufficient to sustain the action. As to matters of this kind, trial courts have no advantage over appellate courts.
 

 In the instant case, the veracity of plaintiff and her-witnesses is not challenged. The defendant denied only in part what they said, lie left, unchallenged, sufficient testimony to warrant a decree for plaintiff. The trial judge manifestly erred in his judgment.
 

 Plaintiff alleged that she was entitled to an allowance or alimony pending these proceedings. As she offered no testimony as to the extent of her needs or as to the ability of her husband to pay, we assume that she intended to abandon that part of her demand.
 

 For the reasons assigned, the judgment appealed from is reversed, and it is now ordered that there be judgment in favor of plaintiff and against defendant granting to her a separation from bed and board as prayed for, all costs to be paid by defendant.